Charles H. Stoneburner and Others, Plaintiffs, *v.* O-Gas-Co.
Sales Corporation and Others, Defendants.

Supreme Court, Schenectady County, November 21, 1929.

*Richmond D. Moot*, for the plaintiffs.

*Abram Lifset* and *Andrew J. Nellis*, for the defendants.

Rogers, J.   The plaintiffs seek injunctive relief from a nuisance. They own homes fronting on Chapel street in the hamlet of Carman, Schenectady county, N. Y.   The defendants' lot adjoins the Stoneburner property, has a frontage of seventy feet on Chapel street, and a depth of two hundred feet.   The Stoneburner property has a frontage of thirty-five feet.   To the east of it and adjoining is the Stahl property with a frontage of thirty-five feet, which, in turn, adjoins the Van Derzee lot.   Across the street from the defendants' ot is the Barringer residence.   A circle around these properties would have a radius of about seventy-five feet.   The plaintiffs

term the section residential. There are other homes on the east side of Wagner avenue, which street intersects Chapel street beyond the Van Derzee property. There are also homes on Chrysler avenue with which Chapel street intersects. Other streets of the hamlet some little distance away from Chapel street are almost exclusively occupied residentially. There are a number of vacant lots near the plaintiffs' property on Chapel street. In the vicinity of plaintiffs' homes there are some industrial plants, a lumber yard, coal pocket adjoining the Barringer property, a large depository for molding sand off Chapel street westerly of the defendants' lot. About three hundred feet to the northerly side of the plaintiffs' properties are the main tracks of the New York Central railroad, and there are switches running along and across Chrysler avenue and to the coal pockets on the south side of Chapel street about opposite the defendants' lot. Trains pass over the main tracks almost constantly, and the switches are used for unloading cars of coal, coke and petroleum products and the loading of molding sand and other material. The locality, therefore, may be said to be used both for homes, and, because of the proximity of the railroad and switches, it is also desirable and is used for businesses having bulky freight deliveries. The plaintiffs' homes are rather modest and inexpensive, yet they are their castles, and while the vicinage is not wholly residential, plaintiffs are entitled to the court's aid in having their homes freed from a private nuisance arising from the unreasonable use by the defendants of their neighboring property.

On the defendants' lot there are seven steel tanks elevated five feet above the ground on concrete piers. Each tank is fourteen feet in diameter and has a capacity of 20,000 gallons. They are in a row extend ng from a point about twenty-five feet from the line of Chapel street back a distance of approximately one hundred and fifty feet, and along and only fifteen inches away from the boundary line between the defendants' lot and the Stoneburner property. These tanks were erected in 1927 and 1928. They are owned and controlled by the defendant O-Gas-Co. Sales Corporation and its tenants. The O-Gas-Co. Sales Corporation with its tenant, the Rex Oil Corporation, are engaged in the business of storing in these tanks and distributing from them gasoline, kerosene and fuel oil. They supply these tanks with the fluids from railroad cars at a nearby switch and draw from them into tank wagons used to distribute the products in and about the city of Schenectady.

Locating the tanks so near the street and contiguous to the Stoneburner line with the nearest tank only fifteen feet from the side of his house, without doubt, reduces the value of the neigh-

boring property irrespective of the emanating gases and odors. The tanks are ugly, ungainly, unsightly structures. They are prominent disfigurations of the landscape. This, however, is *damnum absque injuria.* Our neighbor may offend our sense of the æsthetic with impunity. There is no redress for an architectural monstrosity. Culture and beauty alone are not sufficient basis to invoke the command of the court to remove the ugly and unsightly. One may use his own land as he sees fit for a lawful business as long as there is no tangible injury to his neighbor. When, however, the peace and comfort of the neighbor's home is substantially affected by distasteful, noxious odors a private nuisance arises.

" The ancient maxim of *sic utere tuo ut alienum non lædas* is the foundation of the well-established rule that no one may make an unreasonable use of his own premises to the material injury of his neighbor's premises, and if he does the latter has a right of action even if he is not driven from his dwelling, provided the enjoyment of life and property is materially lessened. (Citing cases.)

" The law relating to private nuisances is a law of degree and usually turns on the question of fact whether the use is reasonable or not under all the circumstances. No hard and fast rule controls the subject, for a use that is reasonable under one set of facts would be unreasonable under another. Whether the use of property to carry on a lawful business, which creates smoke or noxious gases in excessive quantities, amounts to a nuisance depends on the facts of each particular case. Location, priority of occupation and the fact that the injury is only occasional are not conclusive, but are to be considered in connection with all the evidence and the inference drawn from all the facts proved whether the controlling fact exists that the use is unreasonable."

" Trifling results are disregarded, for the courts proceed with great caution and will not interfere with the use of property by the owner thereof unless such use is unreasonable, the injury material and actual, not fanciful or sentimental. *Lex non favet votis delicatorum."* (*McCarty* v. *Natural Carbonic Gas Co.,* 189 N. Y. 40, 46, 47, 49.)

The question of fact, therefore, is, do sufficient obnoxious and nauseous smells and odors emanate from the tanks and disseminating to the plaintiffs' properties cause the use, comfort and enjoyment of their homes to be seriously impaired?

Gasoline, kerosene and fuel oil are volatile. Vapors and gases evaporate from them, especially in warm weather. Heat expands the liquids. In order to permit the escape of the gases and vapors and to provide for expansion the tanks are constructed with vents

and overflow pipes. On various occasions gasoline, kerosene and oil have overflowed from the tanks spreading over the ground beneath the tanks and at times running over upon the Stoneburner property. The plaintiffs claim such overflows are inevitable, due to nature's inexorable law that heat causes gases and expansion, and that defendants have recognized that the overflow is certain to come from time to time by constructing a ditch along the boundary line of the Stoneburner property to catch the overflow and prevent a trespass. These overflows have been very infrequent, only four or five in the course of two years, and they are due to negligence rather than necessity. The tanks were filled too near capacity. If care is taken in filling, a certain factor of safety may be provided so that the heat of the sun will not cause sufficient expansion or gases to effect an overflow. For the negligence resulting in the overflow the plaintiff Stoneburner has an action at law to recover any small damages that he sustained, but no remedy by injunction. It will not be presumed that the negligent acts will continue.

The gases and vapors continuously discharged from the vents of the tanks in hot and warm weather carried by the prevailing wind into the open doors and windows of the Stoneburner residence does call for injunctive relief sufficient to meet the situation and to relieve the plaintiff Stoneburner from the discomfort and annoyance of the distasteful and noxious gases in his home.

The plaintiffs have detected the odor of the petroleum products at their homes, but the evidence is not at all conclusive, or even compelling, that the smells they sensed did not arise from the gasoline, kerosene and fuel oil that had spilled over and spread upon the ground in the proximity of the tanks. There is no sufficient proof that the gases that escape through the vents of the tanks continuously through warm weather are sufficiently voluminous and pungent to surcharge or imbue the atmosphere to make it nauseous and sickening at a distance as far away as the homes of the plaintiffs, beyond the Stoneburner residence. The odor is not comparable with that coming from a garbage disposal plant, like the nuisance considered in *Nicoll* v. *President & Trustees of Village of Ossining* (128 Misc. 848). As to Stoneburner's house, however, which is only sixteen feet from the nearest tank, the testimony is that if the windows and doors on the south side of the house are open in warm weather there is an ever-present smell of petroleum products in the house, and that these smells and odors come from the tank vents. With the wind in the right direction it is probable that the gases emanating from the vents of the four tanks nearest the street, two of which are directly opposite the Stoneburner

house and only fourteen feet away, are carried into the Stoneburner house if the windows and doors on that side of the house are open. I do not think that the small amount of fumes coming from the vents of the other tanks seriously affect the comfort of the occupants of the Stoneburner residence. The tanks could have been constructed underground, although the expense would be much greater. They could have been placed along the southerly line of defendants' lot and farther back from the street, in which event the nearest tank would have been fifty feet away from the Stoneburner house. The defendants brought the nuisance to the plaintiff Stoneburner. His home was there when defendants erected the tanks. He made no protest, however, against the erection of the first tanks in 1927, and experiencing for several months whatever bad effects came from them, he made no objection when the additional tanks were built in 1928.

In connection with defendants' right to operate a lawful business upon its property, if operated in a reasonable manner to prevent injury to its neighbor, it should be considered that there is bound to be in most communities some slight odor of gasoline and oil, for petroleum products are in general use and a necessity in modern life. Gasoline and oil filling stations are ubiquitous. Most homes have garages and many residences oil-burning furnaces.

The O-Gas-Co. Sales Corporation is in control of the property and responsible for the nuisance. It cannot escape liability because it has rented some of the tanks to another. I believe that the material injury suffered by the plaintiff Stoneburner, or the other plaintiffs if their homes are affected, will be remedied by enjoining the defendant O-Gas-Co. Sales Corporation from using the four tanks nearest the Stoneburner house, as now constructed with vents, for the storage of petroleum products during the warm weather period extending from May first to October first. Decision accordingly, with costs to plaintiffs.